IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| (1) | TRIBAL CONSORTIUM, INC., an Oklahoma Corporation, | ) ) ) | |
| | Plaintiff, | ) ) | |
| vs. | | ) ) | Case No. _____ |
| (1) | MARIE PIERSON, an individual, | ) | |
| (2) | VISION GAMING & TECHNOLOGY, INC., a Georgia Corporation; and | ) ) ) | |
| (3) | KP GAMING SUPPLIES, INC., a California Corporation, | ) ) ) | |
| | Defendants. | ) ) | |

## COMPLAINT

### The Parties

1.      Plaintiff, Tribal Consortium, Inc. ("TCI") is an Oklahoma corporation, with its principal place of business in McClain County, Oklahoma. At all times material hereto, TCI has been conducting business within the State of Oklahoma.

2.      Upon information and belief, Defendant Marie Pierson ("Pierson"), is a citizen of the State of Georgia and resides in Norcross, Georgia.

3.      Upon information and belief, Defendant, Vision Gaming & Technology, Inc. ("VGT") is a Georgia corporation, with its principal place of business in Norcross, Georgia. At all times material hereto, VGT has been conducting business within the State of Oklahoma.

4.      Upon information and belief, Defendant, KP Gaming Supplies, Inc. ("KPGS") is a California corporation with its principal place of business in Corona, California. At all times material hereto, KPGS has been conducting business within the State of Oklahoma.

**Jurisdiction and Venue**

5.     TCI, Pierson, VGT, and KPGS are citizens of different States and the amount in controversy in this proceeding exceeds $75,000.00 exclusive of interest and costs. Accordingly, TCI invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1332.

6.     At all times material hereto, negotiations for the contracts and agreements which form the basis for this action occurred between TCI and Pierson in the State of Oklahoma.

7.     At all times material hereto, VGT and KPGS have conducted business within the State of Oklahoma.

8.     On or about December 8, 2004, TCI and VGT entered into a Distribution Agreement and a Participation Agreement (collectively "the Agreements"). The Agreements contemplated performance of the duties and activities almost exclusively within the State of Oklahoma.

9.     The subject matter of the Agreements involved the services of TCI in placing of gaming machines manufactured by VGT with various Indian Tribes located in the State of Oklahoma pursuant to the Oklahoma State-Tribal Gaming Act, 3A O.S. § 261, *et seq*.

10.     To fulfill its obligations under the Agreements, VGT was required to manufacture gaming machines and place them in the stream of commerce with knowledge that such machines would be sent to the State of Oklahoma and placed with Indian Tribes operating gaming facilities and casinos located in the State of Oklahoma.

11.     Accordingly, venue is proper in this Court under 28 U.S.C. § 1391.

**Factual Allegations Relevant to All Claims**

12.     The Distribution Agreement granted TCI, *inter alia*, exclusive rights within the State of Oklahoma to distribute gaming machines manufactured by VGT with Indian Tribes operating

gaming facilities and casinos under the laws of the State of Oklahoma. A copy of the Distribution Agreement is attached as Ex. "A".

13.     The Distribution Agreement further provided that any dispute or controversy relating to said Agreement or any breach of said Agreement shall be settled by arbitration in Atlanta, Georgia ("the Arbitration Clause"). For the reasons stated below, the Arbitration Clause was obtained and procured as a result of improper and unlawful means including fraud, coercion, and overreaching and is therefore void and unenforceable.

14.     The Participation Agreement, provided, *inter alia*, that TCI would exclusively place gaming machines manufactured by VGT with Indian Tribes operating gaming facilities and casinos within the State of Oklahoma. The Participation Agreement further provided that TCI would obtain agreements with Indian Tribes which: (a) allowed placement of gaming machines manufactured by VGT with Indian Tribes operating gaming facilities and casinos in the State of Oklahoma; and (b) provided that VGT and TCI would share in a percentage of revenue generated by the gaming machines. A copy of the Participation Agreement is attached as Ex. "B".

15.     The Participation Agreement included a clause entitled "Governing Law" (hereafter "the Forum Selection Clause") which stated: "This agreement will be governed by and construed in accordance with the laws of the State of Georgia. The parties consent to the jurisdiction of the courts of the State of Georgia. The parties expressly waive all rights, which they may otherwise have under the laws of all other jurisdictions." For the reasons stated below, the Forum Selection Clause was obtained and procured as a result of improper and unlawful means including fraud, coercion, and overreaching and is therefore void and unenforceable.

16.     To facilitate performance of its obligations under the Agreements, TCI formed a

3

subsidiary Oklahoma corporation,  Tribal Gaming, Inc. ("TGI").

17.     At all times material hereto, VGT was aware of TCI's formation of TGI and the

relationship between TCI and TGI.  At no time did VGT raise any objection to the formation of TCI

or TGI's relationship with TCI to further performance of TCI's obligations under the Agreements.

18.     Prior to the time that TCI and VGT entered into the Agreements, VGT had a long-

standing business relationship and business dealings with KPGS.

19.     As part of the long-standing business relationship and business dealings between

VGT and KPGS referenced in ¶ 18, *supra*, VGT authorized KPGS to distribute and sell gaming

machines manufactured by VGT to Indian Tribes in the State of Oklahoma.

20.     At the time that TCI entered into the Agreements with VGT, TCI was unaware of

VGT's agreement with KPGS and VGT did not disclosure the existence of its agreement with KPGS

at the time the Agreements were consummated.

21.     During the term of the Agreements, TCI on its own and by and through TGI,

expended significant time, energy, money and resources negotiating with various Indian Tribes in

the State of Oklahoma and obtained commitments for placing machines manufactured by VGT with

said Indian Tribes and  properly applied for licenses from said Indian Tribes.

22.     As a result of TCI's efforts, TCI by and through TGI entered into formal agreements

with the Osage Nation of Oklahoma whereby the Osage Nation agreed to the placement of a total

of fifty (50) gaming machines in two (2) separate gaming facilities and casinos owned and operated

by the Osage Nation ("the Location Agreements").  Copies of the Location Agreements with TGI

and the Osage Nation are attached respectively as Ex. "C" and "D".

23.     Prior to TCI entering into the Location Agreements, VGT expressed no objections,

4

complaints or concerns regarding the Location Agreements despite having several weeks to review the Location Agreements and having ample opportunities to communicate any objections or concerns to TCI.

24. In addition to the Location Agreements, TCI had spent significant time, energy, money and resources developing business relationships with other Indian Tribes in the State of Oklahoma for the purpose of placing gaming machines manufactured by VGT in gaming facilities and casinos operated by said Indian Tribes for the benefit of the Indian Tribes and TCI.

25. Despite the fact that the Agreements provided that TCI was to be the exclusive distributor for gaming machines manufactured by VGT in the State of Oklahoma, VGT by virtue of its prior agreement with KPGS, authorized and allowed KPGS to distribute gaming machines manufactured by VGT to various Indian Tribes within the State of Oklahoma.

26. In August 2005, VGT attempted to unilaterally change the terms and conditions of the Agreements by informing TCI that it VGT had authorized and allowed KPGS to distribute gaming machines manufactured by VGT to Indian Tribes within the State of Oklahoma.

27. Thereafter, on or about November 16, 2005, VGT notified TCI that it was unilaterally cancelling the Agreements with TCI and the relationship of TCI with VGT as set forth in the Agreements was terminated.

28. Although the Distribution Agreements and the notice referenced in ¶¶ 25, 27, *supra* provided that said Distribution Agreement would remain effective for thirty (30) days from the date of the notice, within this thirty (30) day period, VGT began placing gaming machines it manufactured with the Osage Nation in the State of Oklahoma through another distributor.

29. At the time that VGT notified TCI that it was unilaterally cancelling the Agreements,

5

TCI had, at all times material thereto, acted in good faith and had fully performed all of its obligations under the Agreements.

30.     At all times material hereto, TCI had neither defaulted under nor breached the Agreements and no just cause existed which warranted the termination of the Agreements.

31.     At all times material hereto, Pierson was President/CEO of VGT and purported to act on behalf of VGT. In addition, at all times material hereto, Pierson was responsible for making decisions on behalf of VGT with respect to VGT's performance under and actions relating to the Agreements.

### FIRST CAUSE OF ACTION - BREACH OF CONTRACT AGAINST VGT

32.     TCI incorporates ¶¶ 1 - 31, *supra*, by reference.

33.     With the exception of some clauses of the Agreements including the Arbitration Clause and the Forum Selection Clause, the Agreements constituted enforceable contracts between TCI and VGT.

34.     VGT breached the Agreements, by among other things, unilaterally altering the terms and conditions of the Agreements and by authorizing and allowing KPGS to distribute gaming machines manufactured by VGT to various Indian Tribes within the State of Oklahoma and otherwise failing to act in good faith in discharging its obligations under the Agreements.

35.     As a direct and proximate result of VGT's breach of the Agreements, TCI sustained significant actual and consequential damages including, but not limited to monetary damages, and VGT has damaged and otherwise destroyed TCI's ability to continue doing business as anticipated in the Agreements and the Location Agreements.

36.     The damages sustained by TCI as a direct and proximate result of VGT's breach of

the Agreements exceeds $75,000.00, exclusive of interest and costs.

WHEREFORE, in its first cause of action, TCI prays for judgment against VGT as follows:

a.   An award of actual and consequential damages to compensate TCI for all damages it sustained as a result of VGT's breach of the Agreements which significantly exceeds the sum of $75,000.00, exclusive of interest and costs;

b.   For a reasonable attorney's fee;

c.   For costs and applicable interest; and,

d.   For such other and further relief as this Court deems just, proper and equitable.

## SECOND CAUSE OF ACTION - TORTIOUS INTERFERENCE WITH CONTRACT AGAINST PIERSON, VGT AND KPGS

### TCI'S CLAIMS AS TO PIERSON

37.   TCI incorporates ¶¶ 1 - 36, *supra*, by reference.

38.   TCI had contracts with third parties including the Osage Nation as evidenced by the Location Agreements.

39.   Pierson knew that TCI had contracts with the Osage Nation.

40.   Pierson interfered with TCI's contracts with the Osage Nation by, among other things:

a.   Wrongfully terminating the Agreements without just cause or excuse;

b.   Following its wrongful termination the Agreements with TCI, causing VGT to contact the Osage Nation regarding placement of VGT gaming machines with the Osage Nation. Pierson caused VGT to tell the Osage Nation that

7

TCI was not a representative for VGT and that if the Osage Nation wanted gaming machines manufactured by VGT in its gaming facilities and casinos, the Osage Nation would have to deal directly with VGT; and

c.   Making it impossible for TCI to perform its obligations under the Location Agreements.

41.   Pierson intentionally and fraudulently interfered with TCI's contracts with the Osage Nation by, among other things, terminating the Agreements without just cause or excuse and by failing to act in good faith in performing its duties under the Agreement.

42.   Pierson used improper, fraudulent and unfair means in interfering with TCI's contracts with the Osage Nation and tortiously participated in an unjustified, non-privileged and unexcused interference with the Location Agreements between TCI and the Osage Nation.

43.   As a direct and proximate result of Pierson's intentional and fraudulent conduct in interfering with TCI's contractual relationships with the Osage Nation as evidenced by the Location Agreements, TCI sustained actual damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

44.   As a direct result of Pierson's fraudulent conduct, the corporate veil of VGT should be disregarded to impose personal liability upon Pierson with respect to TCI's tortious interference with contract claim to the extent necessary to promote the interests of law and equity, avoid injustice, promote public policy interests, and allow TCI to obtain complete relief.

45.   Pierson's intentional, fraudulent and tortious interference with TCI's contracts including those with the Osage Nation entitles TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

## TCI'S CLAIMS AS TO VGT

46.     TCI incorporates ¶¶ 1 - 45, *supra*, by reference.

47.     TCI had contracts with third parties including the Osage Nation as evidenced by the Location Agreements.

48.     VGT knew that TCI had contracts with the Osage Nation.

49.     VGT interfered with TCI's contracts with the Osage Nation by, among other things:

     a.     Wrongfully terminating the Agreements without just cause or excuse;

     b.     Following its wrongful termination the Agreements with TCI, VGT contacted the Osage Nation regarding placement of VGT gaming machines with the Osage Nation. VGT told the Osage Nation that TCI was not a representative for VGT and that if the Osage Nation wanted gaming machines manufactured by VGT in its gaming facilities and casinos, the Osage Nation would have to deal directly with VGT; and

     c.     Making it impossible for TCI to perform its obligations under the Location Agreements.

50.     VGT intentionally interfered with TCI's contracts with the Osage Nation by, among other things, terminating the Agreements without just cause or excuse and by failing to act in good faith in performing its duties under the Agreement.

51.     VGT used improper and unfair means in interfering with TCI's contracts with the Osage Nation and tortiously participated in an unjustified, non-privileged and unexcused interference with the Location Agreements between TCI and the Osage Nation.

52.     As a direct and proximate result of VGT's intentional conduct in interfering with

TCI's contractual relationships with the Osage Nation as evidenced by the Location Agreements, TCI sustained actual damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

53.     VGT's intentional and tortious interference with TCI's contracts including those with the Osage Nation entitles TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

### TCI'S CLAIMS AS TO KPGS

54.     TCI incorporates ¶¶ 1 - 53, *supra*, by reference.

55.     TCI had contracts with third parties including VGT as evidenced by the Agreements.

56.     KPGS knew that TCI had contracts with VGT.

57.     KPGS  interfered with TCI's contracts with VGT by, among other things:

   a.      Wrongfully interfering with TCI's exclusive rights under the Agreements;

   b.      Conspiring with VGT to breach the terms of the Agreements, and

   c.      Making it impossible for TCI to perform under the Agreements.

58.     VGT intentionally interfered with TCI's contracts with VGT by, among other things, interfering with TCI's exclusive rights under the Agreements, conspiring with VGT to breach the Agreements and making it impossible for TCI to perform under the Agreements.

59.     KPGS used improper and unfair means in interfering with TCI's contracts with the VGT and tortiously participated in an unjustified, non-privileged and unexcused interference with the Agreements.

60.     As a direct and proximate result of KPGS' intentional conduct in interfering with TCI's contractual relationships with VGT, TCI sustained actual damages in an amount significantly

in excess of $75,000.00 exclusive of interest and costs.

61.    KPGS' intentional and tortious interference with TCI's contracts with VGT entitles TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

WHEREFORE, in its second cause of action, TCI prays for judgment against Pierson, VGT and KPGS as follows:

        a.    An award of actual and consequential damages to compensate TCI for all damages it sustained as a result of VGT's and KPGS' interference with TCI's contracts in an amount significantly in excess of $75,000.00, exclusive of interest and costs;

        b.    For an award of punitive damages in an amount significantly in excess of $75,000.00;

        c.    For costs and applicable interest; and,

        d.    For such other and further relief as this Court deems just, proper and equitable.

**THIRD CAUSE OF ACTION -
TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
AGAINST PIERSON, VGT AND KPGS**

**TCI'S CLAIMS AS TO PIERSON**

62.    TCI incorporates ¶¶ 1 - 61, *supra*, by reference.

63.    TCI had business relationships with various Indian Tribes in the State of Oklahoma and had spent significant time, energy, money and resources developing those business relationships for purposes of placing gaming machines manufactured by VGT in gaming facilities and casinos

11

operated by said Indian Tribes for the benefit of the Indian Tribes and TCI.

64.     At all times material hereto, Pierson knew that TCI had business relationships with other Indian Tribes in the State of Oklahoma as described above.

65.     Pierson interfered with TCI's business relations with other Indian Tribes by, among other things:

        a.     Wrongfully, intentionally and fraudulently terminating the Agreements which prevented TCI from placing gaming machines manufactured by VGT with Indian Tribes in the State of Oklahoma operating gaming facilities and casinos; and

        b.     Otherwise destroying TCI's ability to maintain business relations with Indian Tribes in the State of Oklahoma for the purpose of distributing gaming machines manufactured by VGT with said Indian Tribes for use in their gaming facilities and casinos.

66.     Pierson  intentionally interfered with TCI's business relationships with other Indian Tribes in the State of Oklahoma by, among other things, terminating the Agreements without just cause or excuse, by failing to act in good faith in performing its duties under the Agreement and by acting in a manner which destroyed TCI's ability to maintain business relations with Indian Tribes in the State of Oklahoma.

67.     Pierson used improper, fraudulent and unfair means in interfering with TCI's business relations with other Indian Tribes in the State of Oklahoma and tortiously participated in an unjustified, non-privileged and unexcused interference with said business relationships.

68.     As a direct result of Pierson's fraudulent conduct, the corporate veil of VGT should

be disregarded to impose personal liability upon Pierson with respect to TCI's tortious interference

with business relationships claim to the extent necessary to promote the interests of law and equity,

avoid injustice, promote public policy interests, and allow TCI to obtain complete relief.

69.     As a direct and proximate result of Pierson's intentional and fraudulent conduct in

interfering with TCI's business relationships with other Indian Tribes in the State of Oklahoma, TCI

sustained actual damages in an amount significantly in excess of $75,000.00 exclusive of interest

and costs.

70.     Pierson's intentional, fraudulent and tortious interference with TCI's business

relationships with various Indian Tribes in the State of Oklahoma entitles TCI to an award of

punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

### TCI'S CLAIMS AS TO VGT

71.     TCI incorporates ¶¶ 1 - 70, *supra*, by reference.

72.     TCI had business relationships with various Indian Tribes in the State of Oklahoma

and had spent significant time, energy, money and resources developing those business relationships

for purposes of placing gaming machines manufactured by VGT in gaming facilities and casinos

operated by said Indian Tribes for the benefit of the Indian Tribes and TCI.

73.     At all times material hereto, VGT knew that TCI had business relationships with other

Indian Tribes in the State of Oklahoma as described above.

74.     VGT interfered with TCI's business relations with other Indian Tribes by, among

other things:

> a.     Wrongfully terminating the Agreements which prevented TCI from placing
>
>         gaming machines manufactured by VGT with Indian Tribes in the State of

Oklahoma operating gaming facilities and casinos; and

b.    Otherwise destroying TCI's ability to maintain business relations with Indian Tribes in the State of Oklahoma for the purpose of distributing gaming machines manufactured by VGT with said Indian Tribes for use in their gaming facilities and casinos.

75.    VGT intentionally interfered with TCI's business relationships with other Indian Tribes in the State of Oklahoma by, among other things, terminating the Agreements without just cause or excuse, by failing to act in good faith in performing its duties under the Agreement and by acting in a manner which destroyed TCI's ability to maintain business relations with Indian Tribes in the State of Oklahoma.

76.    VGT used improper and unfair means in interfering with TCI's business relations with other Indian Tribes in the State of Oklahoma and tortiously participated in an unjustified, non-privileged and unexcused interference with said business relationships.

77.    As a direct and proximate result of VGT's intentional conduct in interfering with TCI's business relationships with other Indian Tribes in the State of Oklahoma, TCI sustained actual damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

78.    VGT's intentional and tortious interference with TCI's business relationships with various Indian Tribes in the State of Oklahoma entitles TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

### TCI'S CLAIMS AS TO KPGS

79.    TCI incorporates ¶¶ 1 - 78, *supra*, by reference.

80.    TCI had business relationships with other Indian Tribes in the State of Oklahoma and

had spent significant time, energy, money and resources developing those business relationships for purposes of placing gaming machines manufactured by VGT in gaming facilities and casinos operated by said Indian Tribes for the benefit of the Indian Tribes and TCI.

81.    At all times material hereto, KPGS knew that TCI had business relationships with other Indian Tribes in the State of Oklahoma as described above.

82.    KPGS interfered with TCI's business relations with various Indian Tribes by, among other things:

a.    Wrongfully infringing upon TCI's exclusive rights to distribute gaming machines manufactured by VGT to Indian Tribes in the State of Oklahoma; and

b.    Wrongfully destroying TCI's ability to maintain business relations with Indian Tribes in the State of Oklahoma for the purpose of distributing gaming machines manufactured by VGT with said Indian Tribes for use in their gaming facilities and casinos.

83.    KPGS intentionally interfered with TCI's business relationships with other Indian Tribes in the State of Oklahoma by, among other things, wrongfully infringing upon TCI's rights under the Agreements and by acting in a manner which destroyed TCI's ability to maintain business relations with various Indian Tribes in the State of Oklahoma.

84.    KPGS used improper and unfair means in interfering with TCI's business relations with other Indian Tribes in the State of Oklahoma and tortiously participated in an unjustified, non-privileged and unexcused interference with said business relationships.

85.    As a direct and proximate result of KPGS' intentional conduct in interfering with

TCI's business relationships with other Indian Tribes in the State of Oklahoma, TCI sustained actual damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

86.    KPGS' intentional and tortious interference with TCI's business relationships with various Indian Tribes in the State of Oklahoma entitles TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

WHEREFORE, in its second cause of action, TCI prays for judgment against VGT and KPGS as follows:

a.    An award of actual and consequential damages to compensate TCI for all damages it sustained as a result of VGT's and KPGS' interference with TCI's business relationships in an amount significantly in excess of $75,000.00, exclusive of interest and costs;

b.    For an award of punitive damages in an amount significantly in excess of $75,000.00;

c.    For costs and applicable interest; and,

d.    For such other and further relief as this Court deems just, proper and equitable.

## FOURTH CAUSE OF ACTION - FRAUD / CONSTRUCTIVE FRAUD AGAINST PIERSON AND VGT

### TCI'S FRAUD CLAIM AGAINST PIERSON AND VGT

87.    TCI incorporates ¶¶ 1 - 86, *supra*, by reference.

88.    In entering into the Agreements with TCI, Pierson and VGT made intentional, material misrepresentations to TCI, including, but not limited to:

a.    VGT intended to perform under the Agreements;

b.    VGT intended to act in compliance with the terms of the Agreements;

c.    VGT would not act in a manner designed or intended to injure TCI;

d.    VGT would not terminate the Agreements unless good cause existed to do so in the form of a breach or default by TCI which could not reasonably be cured;

e.    VGT would abide by the terms and conditions of the Agreements and would not impose upon TCI terms or conditions different than those within the Agreements;

f.    The terms and conditions of the Agreements were fair and reasonable;  and

g.    VGT would otherwise act in good faith in entering into and fulfilling its obligations under the Agreements.

89.    The representations which VGT and Pierson made to TCI were false.

90.    At the time the representations were made by VGT and Pierson to TCI, the representations were intentional and false because at the time of the representations, VGT made the representations knowing they were false and/or made them as a positive assertions recklessly without knowledge of the truth.

91.    VGT and Pierson made the false representations with the intention that they be acted upon by TCI.

92.    TCI reasonably acted in reliance upon the false representations made by VGT and Pierson.

93.    The Agreements were prepared by Pierson and VGT by and through their agents.  At

17

the time the Agreements were presented to TCI for acceptance, certain terms and conditions of the Agreements including the Arbitration Clause and Forum Selection Clause were included as a result of VGT's superior bargaining power. TCI had no meaningful opportunity to negotiate the terms and conditions of the Arbitration Clause and Forum Selection Clause and TCI was forced to accept said Clauses as a precondition to entering into the Agreements. The Agreements were presented by Pierson and VGT to TCI as "take it or leave it" proposals which resulted in the provisions of the Arbitration Clause and Forum Selection Clause constituting contracts of adhesion.

94.    The Distribution Agreement was for a term of three (3) years, was automatically renewable at the end of the term, and could be cancelled only upon a breach of or default under the Distribution Agreement which could not be cured.

95.    The Distribution Agreement allowed Pierson and/or VGT to unilaterally determine if an alleged breach of the Distribution Agreement was curable. If Pierson and/or VGT unilaterally determined that an alleged breach or default could not be cured, the Distribution Agreement provided that VGT could terminate said Agreement.

96.    The Distribution Agreement stated that in the event that VGT terminated the Distribution Agreement, although the relationship of VGT and TCI terminated immediately, VGT and TCI were still required to submit any dispute to arbitration pursuant to the Arbitration Clause.

97.    The Participation Agreement was for a term of five (5) years, which would be automatically renewed unless the Participation Agreement was terminated.

98.    The Participation Agreement vested VGT with "the sole and exclusive right to terminate [the Participation Agreement]".

99.    The Participation Agreement provided that upon termination of the Participation

18

Agreement, TCI waived all consequential damages and any other claim which TCI may have against VGT and that by signing the Agreement, TCI released VGT from any liability which existed as of the date of the signing of the Agreement and that by entering into the Agreement, VGT was not violating any other contract to which it was a party.

100.   As evidenced by ¶¶ 13, 15, 95-99, *supra*, the Arbitration Clause and the Forum Selection Clause were entered into, obtained and procured by Pierson and VGT as a result of deceit, fraud, and in an unreasonable, overreaching and coercive manner by, among other things:

    a.    Utilizing VGT's superior bargaining power and coercion to obtain the Arbitration Clause and the Forum Selection Clause as contracts of adhesion;

    b.    Forcing TCI to enter into the Arbitration Clause and Forum Selection Clause as a result of VGT's superior bargaining power and coercion as a prerequisite to allowing TCI to enter into the Agreements;

    c.    Procuring the Arbitration Clause and the Arbitration Clause in the Agreements with full knowledge that it had previously entered into agreements with KPGS which violated the Agreements and with knowledge that it could terminate the Agreements with impunity and force TCI to waive its legal rights and remedies and compel TCI to pursue any relief in a foreign jurisdiction;

    d.    Granting Pierson and VGT the unilateral right to cancel the Agreements with impunity while compelling TCI to arbitrate and resolve its claims in a foreign jurisdiction;

    e.    Allowing Pierson and VGT to unilaterally terminate the Agreements while

contractually eviscerating TCI's ability to pursue legal rights and remedies against TCI;

f.    Imposing coercive, unreasonable and unconscionable terms upon TCI including the Arbitration Clause and Forum Selection Clause;

g.    Furthering Pierson's and VGT's fraudulent scheme of: (1) compelling TCI to expend significant time, energy, money and resources developing contractual and business relationships which would benefit both TCI and VGT; (2) then terminating the Agreements with the intention of reaping the full benefits of TCI's efforts time, energy, money and resources developing contractual and business relationships to the exclusion of TCI; (3) coercing and compelling TCI to forego its legal rights and remedies against VGT; and (4) compelling TCI to arbitrate its claims in a foreign jurisdiction to the benefit of VGT and the detriment of TCI;

h.    Obtaining the Arbitration Claus and Forum Selection Clause by intentionally, fraudulently and unreasonably imposing unconscionable and oppressive terms upon TCI; and

i.    Obtaining the Arbitration Clause and Forum Selection Clause with the fraudulent and coercive intent of depriving TCI of its day in court when VGT unilaterally and wrongly terminated the Agreements.

101.    Collectively, as a result of Pierson's and VGT's fraud, deceit, overreaching, unreasonable and coercive conduct in obtaining and procuring the Arbitration Clause and Forum Selection Clause, said Clauses are void and unenforceable.

102.    As a direct result of Pierson's fraudulent conduct, the corporate veil of VGT should be disregarded to impose personal liability upon Pierson with respect to TCI's fraud claim to the extent necessary to promote the interests of law and equity, avoid injustice, promote public policy interests, and allow TCI to obtain complete relief.

103.    As a direct and proximate result of TCI's acting in reliance upon the false, material representations made by Pierson VGT, TCI suffered damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

104.    Pierson's and VGT's intentional, false representations entitle TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

### TCI'S CONSTRUCTIVE FRAUD CLAIM AGAINST PIERSON AND VGT

105.    TCI incorporates ¶¶ 1 - 104, *supra*, by reference.

106.    At the time the Agreements were entered into between VGT and TCI, Pierson and VGT owed TCI a legal and equitable duty to inform TCI that despite the fact that the Agreements promised to grant TCI exclusive rights to distribute VGT's gaming machines, VGT had authorized and consented to allow KPGS to distribute gaming machines manufactured by VGT in the State of Oklahoma.

107.    Pierson and VGT misstated the truth to TCI about their intention to grant TCI exclusive rights under the Agreements and failed to disclose that they had authorized and granted KPGS the right to distribute gaming machines manufactured by VGT to Indian Tribes in the State of Oklahoma.

108.    The misstatements and omissions of Pierson and VGT to TCI were material.

109.    TCI relied upon Pierson's and VGT's material misstatements and omissions in

21

entering into the Agreements.

110.   As a direct and proximate result of Pierson's and VGT's intentional, material misstatements and omissions upon which TCI relied to its detriment, TCI suffered damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

111.   As a direct result of Pierson's fraudulent conduct, the corporate veil of VGT should be disregarded to impose personal liability upon Pierson with respect to TCI's constructive fraud claim to the extent necessary to promote the interests of law and equity, avoid injustice, promote public policy interests, and allow TCI to obtain complete relief.

112.   Pierson's and VGT's intentional, material misstatements entitle TCI to an award of punitive damages in an amount in excess of $75,000.00 exclusive of interest and costs.

WHEREFORE, in its third cause of action, TCI prays for judgment against VGT as follows:

a.      An award of actual and consequential damages to compensate TCI for all damages it sustained as a result of Pierson's and VGT's fraud and constructive fraud in an amount significantly in excess of $75,000.00, exclusive of interest and costs;

b.      For an award of punitive damages in an amount significantly in excess of $75,000.00;

c.      For costs and applicable interest; and,

d.      For such other and further relief as this Court deems just, proper and equitable.

## FIFTH CAUSE OF ACTION - CONSPIRACY AGAINST PIERSON, VGT AND KPGS

113.   TCI incorporates ¶¶ 1 - 112, *supra*, by reference.

114.    At all times material hereto, Pierson, VGT and KPGS, by and through their agents and employees, reached an agreement and a meeting of the minds to engage in a course of action to improperly reap the benefit of the significant time, energy, money and resources spent by TCI developing contractual and business relationships with Indian Tribes in the State of Oklahoma.

115.    The agreement and meeting of the minds reached by Pierson, VGT and KPGS was ultimately intended and designed to achieve the goal of benefitting Pierson, VGT and KPGS and to exclude TCI from said benefits.

116.    To achieve the above-referenced goal, Pierson, VGT and KPGS combined to engage in one or more unlawful acts and/or to engage in lawful acts by unlawful means including, but not limited to:

    a.    Wrongfully and fraudulently breaching the terms and conditions of the Agreements which prevented TCI from placing gaming machines manufactured by VGT with Indian Tribes in the State of Oklahoma operating gaming facilities and casinos;

    b.    Wrongfully and fraudulently infringing upon TCI's exclusive rights under the Agreements;

    c.    Wrongfully and fraudulently altering the terms and conditions of the Agreements;

    d.    Wrongfully and fraudulently breaching the terms and conditions of the Agreements;  and

    e.    Destroying TCI's ability to maintain business and contractual relations with Indian Tribes in the State of Oklahoma for the purpose of distributing gaming

machines manufactured by VGT with said Indian Tribes for use in their gaming facilities and casinos.

117.    As a direct result of Pierson's fraudulent conduct, the corporate veil of VGT should be disregarded to impose personal liability upon Pierson with respect to TCI's conspiracy claim to the extent necessary to promote the interests of law and equity, avoid injustice, promote public policy interests, and allow TCI to obtain complete relief.

118.    As a direct and proximate result of the conspiracy of Pierson, VGT and KPGS, TCI sustained actual damages in an amount significantly in excess of $75,000.00 exclusive of interest and costs.

119.    The intentional, tortious and wrongful conduct of Pierson, VGT and KPGS in conspiring together with the specific intent of benefitting themselves while damaging TCI entitles TCI to an award of punitive damages in an amount in excess of $75,000.00.

WHEREFORE, in its fourth cause of action, TCI prays for judgment against Pierson, VGT and KPGS as follows:

       a.     An award of actual and consequential damages to compensate TCI for all damages it sustained as a result of the conspiracy of VGT and KPGS in an amount significantly in excess of $75,000.00, exclusive of interest and costs;

       b.     For an award of punitive damages in an amount significantly in excess of $75,000.00;

       c.     For costs and applicable interest; and,

       d.     For such other and further relief as this Court deems just, proper and equitable.

WARD & GLASS, L.L.P.


s/A. Craig Tomlin
Stanley M. Ward, OBA # 9351
Woodrow K. Glass, OBA # 15690
Scott F. Brockman, OBA # 19416
A. Craig Tomlin, OBA # 17497
2600 John Saxon Blvd., Suite 350
Norman, Oklahoma 73071
(405) 360-9700
(405) 360-7902 (fax)

ATTORNEYS FOR PLAINTIFF

***ATTORNEYS' LIEN CLAIMED***
***JURY TRIAL DEMANDED***