IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

TRIBAL CONSORTIUM, INC.,            )
                                    )
            Plaintiff,              )
                                    )
v.                                  )       Case No. CIV-06-238-D
                                    )
MARIE PIERSON, *et al.*,            )
                                    )
            Defendants.             )


## O R D E R

Before the Court are two motions for summary judgment, one filed by Defendants Marie

Pierson ("Pierson") and Vision Gaming & Technology, Inc. ("Vision"), and one filed by Defendant

KP Gaming Supplies, Inc. ("KP"). Defendants seek a judgment as a matter of law pursuant to Fed.

R. Civ. P. 56 on Plaintiff's contract and tort claims arising from a business dispute regarding gaming

devices manufactured by Vision for tribal casinos in Oklahoma. Plaintiff Tribal Consortium, Inc.

has timely opposed the motions, which are at issue.

The case originally involved two written contracts between Plaintiff and Vision, entitled

"Vision Gaming & Technology, Inc. Distribution Agreement for Oklahoma" and "Vision Gaming

& Technology Inc. Participation Agreement."[1] The Distribution Agreement appointed Plaintiff as

Vision's exclusive distributor for the sale of its gaming products in Oklahoma. The Participation

Agreement authorized Plaintiff to place gaming devices owned by Vision in gaming facilities

operated by Native American tribes in Oklahoma and to obtain contracts with the tribes that would

---

[1] Copies of these agreements appear throughout the case record but are attached to the Complaint
as Exhibit A [Doc. No. 1-2] and Exhibit B [Doc. No. 1-3] respectively . For ease of reference, the Court
refers to these contracts hereafter as the "Distribution Agreement" and the "Participation Agreement."

provide for Plaintiff and Vision to share a percentage of the revenue generated by the operation of those devices. The Distribution Agreement contained an arbitration clause, which has now been enforced by a federal district court in Georgia.[2] Plaintiff, Pierson and Vision were ordered "to submit to arbitration all issues arising under the Distribution Agreement." *See Vision Gaming & Tech., Inc. v. Tribal Consortium, Inc*., Civil Action No. 1:06-CV-2267-RWS, Order at 13 (N.D. Ga. Feb. 8, 2007). Thus, all claims relating to the Distribution Agreement are subject to arbitration and cannot be litigated in this case.[3] The federal court in Georgia ruled, however, that "issues arising under the Participation Agreement are not subject to arbitration."[4] *Id*.

Following the order compelling arbitration, Plaintiff filed a First Amended Complaint to assert only nonarbitrable claims. The claims are: (1) against Vision, breach of the Participation Agreement; (2) against all defendants, tortious interference with contract; (3) against all defendants, tortious interference with business relationships; (4) against Vision and Pierson, fraud and constructive fraud; and (5) against all defendants, civil conspiracy. Plaintiff seeks to recover actual damages (including consequential damages) and attorney's fees on its contract claim, and actual and punitive damages on its tort claims.

By their motions, Defendants assert Plaintiff lacks sufficient evidence to establish its claims. Specifically, Vision contends Plaintiff cannot establish a breach of the Participation Agreement. Vision and Pierson contend Plaintiff cannot prove fraud under Georgia law, which allegedly governs their dispute due to a choice-of-law provision in the Participation Agreement. All Defendants

---

[2] This case was stayed to permit Vision to seek enforcement of the arbitration clause in a forum to which the parties had contractually agreed.

[3] The arbitration agreement was broad and encompassed "[a]ny dispute or controversy of or relating to this [Distribution] Agreement." *See* Distribution Agreement, § 14.

[4] The Participation Agreement contains a forum selection clause providing for litigation of disputes. *See* Participation Agreement, § 18.

contend Plaintiff cannot establish its claims of tortious interference with contractual or business relations and civil conspiracy.

## Standard of Decision

Summary judgment is appropriate if the pleadings, affidavits, depositions, and evidence on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, then all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact, thus warranting summary judgment. *Celotex*, 477 U.S. at 322-23. If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); Fed. R. Civ. P. 56(e). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672.

## Statement of Undisputed Facts[5]

Vision manufactures Class III gaming devices known as "Pot O' Gold" (or POG) machines.[6] Pierson is CEO of Vision. Plaintiff is a corporation formed in March, 2004, with Aaron Vogt ("Vogt") as an officer and 49% shareholder. In the summer of 2004, Pierson was aware that Oklahoma was considering legislation to allow Class III gaming. Vogt contacted Pierson and requested a meeting to discuss the possibility of Vision doing business with Plaintiff in Oklahoma. Pierson and Vogt subsequently met at Vision's headquarters in Atlanta, Georgia, and discussed the possibility of entering into a distribution agreement and a revenue participation agreement if proposed Class III legislation passed in Oklahoma.[7] Under a participation agreement, Vision-owned machines would be placed in casinos and maintained by Plaintiff, and all three entities – Vision, Plaintiff, and the casino – would share or participate in revenues from the machines. The relationship between Vision, Plaintiff, and the tribe that owned the casino would be governed by other agreements as well, including a distribution agreement between Plaintiff and Vision and a location agreement between Plaintiff and the tribe. Under a distribution agreement, Vision would sell gaming machines outright to Plaintiff, after Plaintiff located a tribal casino interested in buying them, and Plaintiff would then sell the machines to the casino and collect a commission on the sale. Between Plaintiff and Vision, both a participation agreement and a distribution agreement were

---

[5] These facts include both undisputed facts stated by Defendants in their supporting briefs and additional facts stated by Plaintiff in its response brief, which are properly supported by the record and which are undisputed by Defendants in their reply briefs.

[6] Class III gaming is a residual category in a classification system established by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2719. It includes "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." *Id*. § 2703(7)(B)(ii). IGRA allows Class III gaming that is conducted under a tribal-state compact entered into between an "Indian tribe having jurisdiction over the Indian lands upon which a Class III gaming activity is being conducted" in "a state in which gambling devices are legal." *Id*. § 2710(d)(3), (6).

[7] The parties dispute whether this meeting occurred in August or October of 2004.

necessary because the parties contemplated that Plaintiff would do both sales and placements of Vision's POG machines in Oklahoma. A sale (distribution) of machines involved a transfer of title and no ongoing relationship, but a placement (participation) involved a long-term contractual relationship between Plaintiff, Vision, and a tribe.

After their initial meeting, Pierson sent Vogt a due diligence packet for Plaintiff and drafts of the agreements for review.[8] The due diligence packet included verification that Plaintiff was registered with the United States Department of Justice ("DOJ") under the Gambling Devices Transportation Act, or Johnson Act, 15 U.S.C. §§ 1171-78. Vogt subsequently provided the requested information to Vision, including a letter from DOJ verifying Plaintiff's registration effective August 25, 2004.

In November, 2004, the Oklahoma Indian Gaming Association held an industry trade show in Oklahoma City. Both Plaintiff and Vision had booths at the show. Vision shipped four POG machines and software to Vogt to be used at the show. Defendant KP also had a booth at the show, within sight of Plaintiff's booth. During the show, Pierson first learned from KP's representative, Kevin Thornton ("Thornton") that Vision's former CEO, Andre Hilliou, had offered KP distribution rights for POG games in Oklahoma. However, Thornton stated that KP only wanted to purchase between 500 and 800 POG machines for Cherokee Nation casinos in Oklahoma and would do no other distribution in Oklahoma. At the time, Plaintiff and Vision had not executed any agreements. The parties dispute whether Pierson and Vogt discussed Pierson's conversation with Thornton or KP's proposed activities in Oklahoma at that time. Vision and Plaintiff, through Pierson and Vogt,

---

[8] Defendants state that Pierson understood Vogt ran Plaintiff's business and that his family owned the company. Plaintiff states this fact is irrelevant to the summary judgment issues.

subsequently signed the Participation Agreement at issue in this case, together with the Distribution Agreement subject to arbitration, effective December 8, 2004.

In August, 2005, Tribal Gaming, Inc. ("TGI") was incorporated as a wholly owned subsidiary of Plaintiff. After the incorporation, Vision received reports and correspondence bearing TGI's letterhead. Pierson has testified that she did not review these reports and was unaware of the change.

After a gaming industry trade show in Las Vegas in September, 2005, Vision learned from a representative of the Miami Tribe that the tribe would not allow Vogt to service its casino and would not act on Plaintiff's application for a vendor's license from the tribe. The Miami Tribe had concerns about Plaintiff, which had not done any business previously and thus had no business references, and about Vogt, who had a criminal record, a prior bankruptcy, and only one technician to service machines. During the conference, Vogt had given Vision's chief administrative officer, Tammy Wilson ("Wilson"), some financial affidavits authorizing the release of financial information and requested that the forms be signed by Vision's board of directors. Vogt represented that the signed forms were requested by the Peoria Tribe as part of a license application. Wilson considered the request unusual and was particularly concerned that the tribe would request personal financial information of Vision's directors. After further investigation, Vision's directors did not sign the forms. Vision informed Plaintiff by letter that the Peoria Gaming Commission did not have a pending application from Plaintiff and had not requested such financial information. Vision also requested an accounting from Plaintiff regarding a $25,000 advance that Vision had given Plaintiff for license fees.

On October 26, 2005, the Gaming Commission of the Osage Tribe issued a Class II vendor license to TGI. On October 27, 2005, Pierson received a form location agreement indicating that

TGI would place Vision's POG machines in Osage tribal casinos. Vogt had previously discussed with Pierson that he intended to form other companies or subsidiaries to carry out Plaintiff's business plans, but Vision had received no prior notice that TGI had been formed for the purpose of carrying out Plaintiff's obligations under the Participation Agreement. After October 27, 2005, Wilson reviewed the form location agreement and noticed the proposed agreement was for TGI. Wilson then began to investigate and determined TGI was Plaintiff's subsidiary but Vision had not done any due diligence inquiry regarding TGI due to the lack of prior notice. On November 7, 2005, Vision notified Vogt's attorney, Hershel Franklin ("Franklin"), of objections to the form location agreement and stated that no signed agreements would be honored without prior Vision approval. Franklin and Wilson exchanged electronic messages the next day concerning the objections. On November 8, 2005, TGI entered into two location agreements with the Osage Nation of Oklahoma for the placement of Vision's POG machines in Osage casinos.

In the Participation Agreement, Plaintiff "agree[d] not to utilize or employ third parties in connection with [Plaintiff's] performance under this agreement or otherwise for the benefit of Vision without identifying all such persons to Vision and without first obtaining the prior written approval of Vision." *See* Participation Agreement, § 13.1. Written notice was required. *Id*. § 16. The parties disagree whether the provision regarding third parties would apply to a wholly-owned subsidiary like TGI. Vision takes the position that upon receiving written notice that a subsidiary would be performing Plaintiff's duties under the Participation Agreement, Vision would have performed a due diligence inquiry regarding that entity and assured itself that the entity was in compliance with regulatory and licensing laws, such as registration with DOJ under the Johnson Act, and upon approval, Vision would have amended the Participation Agreement to include the entity. *See id*. § 20.3 (providing for amendment by a signed writing). Plaintiff points out that the Participation

Agreement states it is a "personal contract and is entered into in reliance by Vision and in the personal qualifications of [Vogt], and his representations to Vision that he will substantially participate in the ownership and operation of the [Plaintiff]." *Id*. § 3.3. Plaintiff notes that Vogt was also substantially participating in the ownership and operation of TGI, and Vision knew of this fact when it subsequently terminated the Participation Agreement.

TGI first became registered with DOJ under the Johnson Act on January 3, 2006.[9] Also, TGI's form of location agreement contained a provision that Vision would not have approved because similar provisions were being challenged by the National Indian Gaming Association.[10] Vision also would have required that TGI be added to Vision's insurance policy covering the POG machines before placement of any machines under a contract with TGI. Plaintiff objects to these facts as immaterial because these defects could have been cured if Vision had not terminated the Participation Agreement.

On November 15, 2005, Wilson sent a letter to Vogt stating that Vision did not approve the Osage location agreements he had submitted. Wilson then recommended to Pierson that the Participation Agreement be terminated due to Plaintiff's breaches of the agreement. Pierson decided to terminate Vision's contracts with Plaintiff primarily because Vogt was untruthful about his licensing attempt with the Peoria Tribe, the only license he obtained was for TGI and not Plaintiff, and he was refused a license by the Miami Tribe, which adversely affected Vision's own licensing. On November 16, 2005, Vision gave written notice of its termination of the Participation Agreement through a letter from its counsel. This letter stated additional reasons for the termination, including

---

[9] Plaintiff questions whether TGI was required to register with DOJ and argues that, if necessary, TGI could have registered before placement of POG machines in the Osage casinos.

[10] Plaintiff states the final location agreements between TGI and the Osage Nation did not contain this provision, but this statement is unsupported by the factual record.

the disclosure of confidential and proprietary information to a third party. This stated reason is unexplained by the factual record, except by reference to TGI as a third party. On November 18, 2005, Vision's counsel sent a cease and desist letter to TGI stating that TGI's representations of being an authorized dealer, distributor or seller of Vision's products was a violation of Vision's intellectual property rights. Both letters were sent to the same mailing address and addressed to Vogt's attention.

At the time of the termination, Plaintiff had not obtained a vendor's license from any tribe in Oklahoma. Vogt had obtained only one vendor's license – TGI's license for Osage casinos. Plaintiff contends that Vogt did not have sufficient time or opportunity to obtain vendor licenses between the time that POG machines could legally be placed in Oklahoma in the summer of 2005, and the termination of the Participation Agreement in November, 2005. However, Plaintiff provides no facts concerning the vendor licensing process. Vision provides information only about the cost of licensing applications. Vision advanced a total of $25,000 to Plaintiff in February and April, 2005, to permit Plaintiff to submit applications to Oklahoma tribes.

After the termination, Vision negotiated directly with the Osage Nation regarding the placement of POG machines in its casinos and, at the tribe's request, entered into a participation agreement with another vendor, Foris Gaming, to place the games. Vision subsequently placed POG machines in Osage casinos under its agreement with Foris Gaming. This agreement provided a greater share of revenue for Vision than the Participation Agreement with Plaintiff would have provided.

Regarding KP, there is no evidence that the Participation Agreement was ever provided to KP or that KP knew the terms of the written agreements between Plaintiff and Vision. Plaintiff points to evidence that Pierson remarked to KP's representative, Thornton, at the November, 2004,

trade show when informed that KP had been offered distribution rights for POG machines in Oklahoma: "Why are you telling me this now? You're dropping this bombshell, and I have made a commitment to Aaron for Oklahoma." *See* Pierson dep. 64:14-16. By "commitment," Pierson meant that she and Vogt had agreed on the terms of distribution and participation agreements for Oklahoma, although written agreements had not been signed.

It is undisputed that, during the term of the Participation Agreement, KP did not place (for participation) any POG games in a casino within Oklahoma and the business dealings between Vision and KP regarding POG machines in Oklahoma involved only distribution (sales).[11] Plaintiff points to communications between Pierson and representatives of KP during the term of the Participation Agreement about sales of machines to KP for marketing to tribes in Oklahoma. The messages suggest that KP was targeting several tribes other than the Cherokee Nation. KP also expressed to Pierson an interest in having a "more involved role" in Oklahoma and inquired whether that was possible. *See* Pl.'s Resp. KP's Mot. Summ. J., Ex. 3 [Doc. No. 97-4] at 5 (message dated 3/24/05 from Rich Bassi, forwarding message dated 3/4/05). Pierson testified that KP's representatives informed her that they had attempted to market POG machines to other casinos in Oklahoma. Vogt testified that Plaintiff was negotiating with the Cherokee Nation for a location agreement to place Vision's POG machines in its casinos and that KP's efforts to negotiate a deal with the Cherokee Nation involving a purchase from Vision, as well as KP's approaches to other tribes, interfered with Plaintiff's business efforts because "[i]t confuses tribes as to who they're supposed to deal with." *See* Vogt dep. 86:12-87:3. Vogt objected to Vision's proposed sale of POG

---

[11] Plaintiff makes an assertion that KP placed POG machines in a tribal casino owned by the Pottawatomie Tribe during the term of the agreement. This assertion lacks any citation to the record or factual support and is, therefore, disregarded.

machines to KP for Cherokee casinos and complained to Vision and Pierson about KP's activities in Oklahoma, but Plaintiff continued its efforts to perform the Participation Agreement.

## Discussion

### A.  Applicable Law

"A federal court sitting in diversity . . . must apply the substantive law of the forum state, including its choice of law rules." *Otis Elevator Co. v. Midland Red Oak Realty Inc.*, 483 F.3d 1095, 1101 (10th Cir. 2007). "In Oklahoma, '[t]he general rule is that a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement of the contract is sought.'" *Id.* (quoting *Williams v. Shearson Lehman Bros., Inc.*, 917 P.2d 998, 1002 (Okla. App. 1995)). Vision and Pierson seek to enforce a choice-of-law provision of the Participation Agreement that states:

> This agreement will be governed by and construed in accordance with the laws of the State of Georgia. The parties consent to the jurisdiction of the courts of the State of Georgia. The parties hereto expressly waive all rights, which they may otherwise have under the laws of all other jurisdictions.

*See* Participation Agreement, § 18. Based on this contractual provision, Vision and Pierson assert that Plaintiff's breach of contract and fraud claims against them are governed by Georgia law.

Plaintiff does not disagree with this assertion except to argue, in a footnote, that Georgia law applies only to its contract-based claim.[12] Plaintiff contends, without citation of legal authority, that the provision should not apply to its tort claims against Vision and Pierson of fraud or constructive fraud, which are independent of the contract. However, the fraud claims argued in Plaintiff's

---

[12] Plaintiff alleged in its pleading that the choice-of-law provision of the Participation Agreement is invalid because this provision "was obtained and procured as a result of improper and unlawful means including fraud, coercion, and overreaching and is therefore void and unenforceable." *See* First Am. Compl. [Doc. No. 38], ¶ 13. Plaintiff's summary judgment submissions are silent concerning this claim for invalidity of the choice-of-law provision, and therefore, the Court deems the claim abandoned.

summary judgment brief are based on alleged misrepresentations of the exclusive nature of the Participation Agreement. The premise of these claims – that exclusivity was an unwritten term of the Participation Agreement – requires interpretation of the Participation Agreement and implicates the parol evidence rule, which is a rule of substantive law governing contract construction. *See First Nat'l Bank v. Honey Creek Entertaining Corp.*, 54 P.3d 100, 103 (Okla. 2002). Plaintiff expressly agreed that the Participation Agreement would be construed in accordance with Georgia law. Therefore, the Court applies Georgia law with respect to these issues.

**B.** **Breach of the Participation Agreement**

The Court has distilled from the arguments presented by Plaintiff in opposition to summary judgment that Plaintiff claims Vision breached the Participation Agreement in three ways: (1) by improperly terminating the contract and failing to pay Plaintiff a share of revenues generated by the placement of POG machines in Osage casinos, for which TGI had secured location agreements; (2) by allowing KP to make efforts to place POG machines in Oklahoma because Plaintiff had exclusive rights to do this; and (3) by failing to cooperate in Plaintiff's efforts to perform the contract, allegedly in breach of the implied covenant of good faith and fair dealing.

**1.** **Termination**

The Participation Agreement expressly authorized either party to "terminate this agreement for cause, including breach of any material provision of this agreement by the other party, by giving written notice of termination." *See* Participation Agreement, § 3.5. As the Court understands Plaintiff's position, Plaintiff contends that none of the reasons given by Vision for terminating the Participation Agreement constituted either "cause" or a breach of a material provision by Plaintiff.

A key breach alleged by Vision is Plaintiff's use of TGI to perform Plaintiff's obligations under the Participation Agreement without obtaining Vision's approval of TGI's involvement, as

required by the contractual provision regarding employment of third parties. The analysis of this alleged breach hinges on whether TGI was a "third party" to the Participation Agreement within the meaning of this provision.

The Participation Agreement did not define the term "third parties," but did define the term "affiliates" to include a subsidiary, like TGI, that was "substantially owned or controlled by" a party. *See* Participation Agreement, § 1.[13] The only express reference in the Participation Agreement to affiliates of Plaintiff appears in a provision regarding indemnification, by which Plaintiff agreed to indemnify Vision against all actions and claims "which are based in whole or in part upon the acts or omissions of [Plaintiff], its employees, servants, agents, affiliates, or any other person for whose acts or omissions [Plaintiff] is or may be liable." *Id.* § 19. This provision seems to anticipate that Plaintiff might act through agents or affiliates in performing the Participation Agreement. However, this possibility does not resolve the question of whether the requirement of obtaining Vision's approval of "third parties" might also apply to affiliates.

Plaintiff relies on two arguments regarding the definition of the term "third parties." First, Plaintiff argues that the Participation Agreement should be interpreted consistently with the Distribution Agreement, which specifically allowed Plaintiff to form a subsidiary. The Distribution Agreement stated that "a change in corporate form, for example to a subsidiary or affiliated entity under the same ownership and management, shall not be a substantial change" for purposes of a provision preventing an assignment or transfer of the agreement by either party, to "include any change in the ownership, or control of either party, which in [sic] the other party deems substantial." *See* Distribution Agreement, § 25. In the Court's view, however, the absence of a similar provision

---

[13] "'Affilliates' means any person or entity substantially owning or controlling, or substantially owned or controlled by, or under common ownership or control with either party, directly or indirectly."

in the Participation Agreement suggests it did <u>not</u> permit Plaintiff to make a change in corporate form.

Unlike the Distribution Agreement, the Participation Agreement absolutely prohibited Plaintiff from assigning or otherwise transferring its rights or obligations under the contract, either "voluntarily or by operation of law," while giving Vision a right of assignment. *See* Participation Agreement, § 20.1. Further, the Participation Agreement expressly limited changes in Plaintiff's ownership or control by providing that a failure of Vogt to substantially participate in the corporation's ownership or operation was a ground for immediate termination of the contract.[14] *See id*. § 3.3. The nature of the two agreements – one governing sales transactions and the other governing Plaintiff's placement and operation of Vision's products in casinos – was significantly different, and the Participation Agreement was designed to address Vision's additional concerns with regard to actions undertaken by Plaintiff on its behalf. Notably, although the Distribution Agreement contained only a simple provision requiring Plaintiff to comply with all applicable gaming laws and regulations,[15] the Participation Agreement provided for Plaintiff to "operate Class II and/or Class III gaming devices, as defined by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq*., pursuant to agreements with one or more Indian tribes" and contained no less than seven provisions regarding licensing and compliance with gaming laws and regulations.[16] Perhaps most importantly, the Distribution Agreement expressly provided: "The parties specifically agree that this agreement shall not apply to gaming devices operated by [Plaintiff] pursuant to the

---

[14] Plaintiff relies on Vogt's involvement in TGI to argue that Vision's concern remained satisfied, notwithstanding Plaintiff's use of TGI to perform the Participation Agreement. This argument does not address the question of whether Plaintiff was authorized to use TGI without Vision's prior approval.

[15] *See* Distribution Agreement, § 21.

[16] *See* Participation Agreement, §§ 3.6, 3.7, 3.8, 4.1(i), 6(g), 14, 15.

Participation Agreement of the parties and that any gaming devices so operated will be owned by [Vision] and operated by [Plaintiff] in accordance with that agreement." *See* Distribution Agreement, § 1. For all of these reasons, the Court concludes, as did the federal court in Georgia, that the Participation Agreement must be read separately from the Distribution Agreement and that the Participation Agreement should be interpreted according to its own terms.[17]

Second, Plaintiff argues that the law generally does not regard a parent corporation as a stranger to its subsidiary's contracts with others for purposes of tortious interference with contract, and thus a subsidiary should not otherwise be regarded as a stranger to its parent's contracts. *See* Pl's Resp. Br. [Doc. No. 98] at 15-16 (citing *Morast v. Lance*, 631 F. Supp 474, 482 (N.D. Ga. 1986), *aff'd*, 807 F.2d 926 (11th Cir. 1987); *abrogated on other grounds by Haddle v. Garrison*, 525 U.S. 121 (1998); *Nexus Serv., Inc. v. Manning Tronics, Inc.*, 410 S.E.2d 810 (Ga. Ct. App. 1991)); *see also Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*, 503 S.E.2d 278, 283-84 (Ga. 1998) (endorsing the "stranger doctrine" for tortious interference claims). The question presented in this case, however, is the proper interpretation of a contract according to the intention of the parties as set forth in the contract. *See Deep Six, Inc. v. Abernathy*, 538 S.E.2d 886, 888 (Ga. Ct. App. 2000); Ga. Code Ann. § 13-2-3 ("The cardinal rule of construction is to ascertain the intention of the parties."). Under Georgia law, as in most jurisdictions, the construction of a contract is a question of law and follows a three-step process: "The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still

---

[17] The parties' expressed intention in this regard negates the rule of construction urged by Plaintiff that documents should be read together when they were executed at the same time in a single transaction.

remains, the jury must then resolve the ambiguity." *Deep Six*, 538 S.E.2d at 888; *see also Ali v. Arabi*, 589 S.E.2d 827, 829 (Ga. Ct. App. 2003).

Utilizing this procedure, the Court finds the Participation Agreement is not ambiguous. In the realm of contracts generally, the term "third party" is commonly understood to mean a nonparty to the contract, that is, a person or entity that was not a party or signatory to the contract. In the context of this particular contract involving a regulated industry with multiple licensing or permit requirements, a prohibition against employing "third parties" would be understood to include a separate legal entity that was not a party to the contract. The Participation Agreement is replete with provisions that required Plaintiff to maintain necessary licenses and permits and comply with regulatory laws, that warranted Plaintiff's compliance with licensing and regulatory requirements, and that assured Vision of Plaintiff's compliance with these provisions of the contract and with all applicable gaming regulations from various jurisdictions. *See* Participation Agreement, §§ 3.6, 3.7, 3.8, 4.1(i), 6(g), 14.1, 14.2 and 15.1. The Participation Agreement also addressed title to goods provided by Vision and contained a security agreement for purposes of the Uniform Commercial Code under which Plaintiff was designated as the debtor. These provisions also mentioned third parties by requiring notice of Vision's interest and continued perfection of Vision's rights if Plaintiff transferred possession of the goods to a third party. "A subsidiary is generally considered under law to be a separate legal entity from its parent," and the relationship between the two corporations is insufficient by itself to establish a subsidiary's rights under the parent corporation's contract. *See Reeves v. Mohawk Factoring, Inc.*, 583 S.E.2d 487, 488 (Ga. Ct. App. 2003). Regulatory requirements and the UCC would apply separately to Plaintiff and TGI, and there is no basis in the Participation Agreement to conclude the parties intended a different result under the contract.

Moreover, any ambiguity in the term "third party" can be resolved through the applicable rules of contract construction:

(1) Parol evidence is inadmissible to add to, take from, or vary a written contract . . . ;

(2) Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. . . . .

* * * *

(4) The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part; . . . .

Ga. Code Ann. § 13-2-2. Applying these rules to the Participation Agreement, the Court finds from an examination of the whole contract, and the lack of a contrary indication from any part, that the term "third party" should be interpreted consistent with the usual understanding of contracting parties and should be read to mean a separate legal entity that was not a signatory to the contract, including a subsidiary or affiliated corporation.

Finally, Plaintiff argues that if TGI was a "third party" under the Participation Agreement, Vision waived the requirement of written notice of TGI's involvement because Vision failed to object when it received actual notice through reports bearing TGI's letterhead and a draft location agreement that named TGI as the contracting party. Plaintiff's waiver argument is unsupported by record facts sufficient to prove that Vision waived its contractual rights. As stated in Plaintiff's brief, a waiver of rights is "the voluntary relinquishment of a known right and may be established by express statements or implied by conduct." *Kennestone Hosp., Inc. v. Hopson*, 538 S.E.2d 742, 745 (Ga. 2000). Plaintiff neglects to complete the quotation from the cited case, which also states: "An implied waiver is one shown by a party's decisive, unequivocal conduct reasonably inferring the intent to waive. Ordinarily, silence is insufficient to establish a waiver unless there is an

obligation to speak." *Id.* (internal quotation omitted); *see also Bollea v. World Championship Wrestling, Inc.*, 610 S.E.2d 92, 99 (Ga. Ct. App. 2005) (waiver by conduct must be based on acts or omissions that manifest an intent to relinquish a known particular right).

Plaintiff points to no statement or conduct by Vision that manifests an intent to waive its rights under the Participation Agreement to receive written notice and give prior approval of TGI's performance of the contract. Instead, Plaintiff argues that Vision's silence or inaction amounts to a waiver. This argument is contrary to law and contrary to the Participation Agreement, which expressly provides: "The failure of Vision to enforce any provision of this agreement shall not constitute a waiver of any right that Vision may have. No waiver by Vision, whether express or implied, of the terms of this agreement or of any breach or default of them by [Plaintiff] will constitute a continuing waiver unless made in writing and signed by a director of Vision." *See* Participation Agreement, § 21. Therefore, Plaintiff's claim of waiver fails as a matter of law.

For all of these reasons, the Court finds that Plaintiff could not utilize TGI to perform Plaintiff's obligations under the Participation Agreement without written notice to Vision as required by the contract and Vision's prior written approval. Clearly, Vison was not required to accept location agreements TGI obtained with the Osage Nation without Vision's approval. Further, Plaintiff's failure to obtain tribal licenses and comply with regulatory laws provided grounds for immediate termination. *See id.* § 3.8. Thus, Vision did not breach the Participation Agreement by terminating the contract. Accordingly, Plaintiff had no right to prevent Vision from contracting with another party to place and operate POG machines in Osage casinos, as requested by the Osage Nation, after the Participation Agreement ended. Therefore, Plaintiff has failed to demonstrate a genuine dispute of materials fact that would preclude summary judgment on its breach of contract claim based on Vision's termination of the Participation Agreement.

## 2. Exclusivity

Plaintiff relies on oral statements by Pierson and a written statement in the Distribution Agreement to establish that Plaintiff had an exclusive right to place POG machines in tribal casinos in Oklahoma. The referenced provision of the Distribution Agreement states: "[Vision] appoints [Plaintiff] to be its exclusive distributor for the sale of [Vision] products . . . for the distribution in the location of Oklahoma and such other jurisdictions as may be agreed in writing . . . ." *See* Distribution Agreement, § 1. This same section of the Distribution Agreement, however, contains the provision quoted in Part 1 above regarding the separateness of the two contracts; it expresses the parties' intention and specific agreement that the exclusive distributorship "shall not apply to gaming devices operated by [Plaintiff] pursuant to the Participation Agreement." *Id.* Further, as to Pierson's oral statements, the law is clear that such statements cannot be used to vary the terms of a valid, unambiguous written contract. *See Parker v. Cook*, 548 S.E.2d 387, 388 (Ga. Ct. App. 2001); *see also Smith v. Standard Oil Co.*, 180 S.E.2d 691, 692-93 (Ga. 1971).[18] Therefore, Plaintiff's effort to "read into the Participation Agreement that [Plaintiff] was supposed to be the sole entity to place POG games in Oklahoma casinos" necessarily fails. *See* Pl's Resp. Pierson & Vision's Mot. Summ. J. [Doc. No. 98] at 20.

Moreover, Plaintiff has not demonstrated that Vision breached any implicit promise of exclusivity in the Participation Agreement. Plaintiff has not presented any properly supported fact to show that KP, or any other entity, placed POG gaming machines for operation and revenue participation within Oklahoma during the term of the contract. Therefore, for this additional reason,

---

[18] Plaintiff's claim of fraud in the execution of the Participation Agreement is discussed below. Plaintiff's breach of contract claim assumes the validity of the contract.

Plaintiff has failed to demonstrate a genuine dispute of material fact concerning its breach of contract claim based on any promise of exclusivity in the Participation Agreement.

### 3. Implied Duty of Good Faith

Plaintiff also contends Vision breached the Participation Agreement by violating an implied duty of good faith and fair dealing in performing its contractual obligations. A breach of the implied covenant of good faith is not an independent cause of action. *See Stuart Enter. Int'l, Inc. v. Peykan, Inc.*, 555 S.E.2d 881, 884 (Ga. Ct. App. 2001). "The implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself. As such, the covenant is not independent of the contract." *Id.*; *see also Myung Sung Presbyterian Church, Inc. v. North Amer. Ass'n of Slavic Churches & Ministries, Inc.*, 662 S.E.2d 745, 748 (Ga. Ct. App. 2008); *WirelessMD, Inc. v. Healthcare.com Corp.*, 610 S.E.2d 352, 358 (Ga. Ct. App. 2005). Plaintiff argues in its summary judgment brief that Vision breached this covenant in the Participation Agreement by terminating the contract without just cause (thereby depriving Plaintiff of earned monies) and failing to cooperate with Plaintiff in its efforts to perform the contract and obtain location agreements. *See* Pl.'s Resp. Defs.' Mot. Summ. J. [Doc. No. 98] at 23-24. The Court has rejected Plaintiff's position regarding Vision's termination of the Participation Agreement. Thus, the Court addresses only Vision's alleged failure to cooperate with Plaintiff in procuring location agreements.

Plaintiff fails to present any argument or authority for implying in the Participation Agreement a duty of Vision to cooperate in Plaintiff's efforts to negotiate location agreements. The Court's research reveals the following principle of Georgia law: "An implied term in an agreement exists where it is reasonable and necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they deemed it unnecessary to state." *Fisher v. Toombs County Nursing Home*, 479 S.E.2d 180, 184 (Ga. Ct. App. 1996); *see also Higginbottom v. Thiele*

*Kaolin Co.*, 304 S.E.2d 365, 366 (Ga. 1983) ("the introduction of an implied term into the contract of the parties can only be justified . . . where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties"); *Myung Sung*, 662 S.E.2d at 748; *WirelessMD*, 610 S.E.2d at 355. The Court finds that Plaintiff has failed to articulate or justify an implied duty of Vision with regard to negotiating location agreements. Moreover, assuming the existence of such a duty, Plaintiff has failed to present sufficient facts to establish that Vision breached it. The only efforts to negotiate location agreements shown by the record were made by TGI rather than Plaintiff. Plaintiff has not shown that it engaged in any such negotiations, or even obtained a license to do so, at any time during the term of the Participation Agreement. Therefore, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of material fact concerning its breach of contract claim based on Vision's alleged breach of its duty of good faith.

For these reasons, the Court finds that Vision is entitled to summary judgment on Plaintiff's breach of contract claim.

## C.      Actual and Constructive Fraud

Plaintiff claims that Vision and Pierson induced Plaintiff to enter into the Participation Agreement by intentionally or negligently making false representations or omissions of material facts. The misrepresentations or omissions identified in Plaintiff's summary judgment arguments are Vision's oral promise (through Pierson) of an exclusive right to place and participate in POG gaming machines in Oklahoma and Vision's alleged failure to disclose a prior agreement with KP regarding placement of POG machines within Oklahoma.

The Supreme Court of Georgia has stated the law of fraudulent inducement of a contract as follows:

An action for fraudulent inducement can be made out in one of two ways. First, a plaintiff could show that the defendant made a false, material representation of an existing fact with knowledge that it was false or with reckless disregard as to whether it was true and that it was made with the intent that it be acted upon by the plaintiff; and, further, that the plaintiff acted upon the misrepresentation in reasonable reliance of its truth in a manner reasonably foreseeable by the defendant and to the plaintiff's proximate injury. Additionally, a plaintiff could show that the defendant, instead of misrepresenting an existing fact, made promises as to future events with the present intention not to perform or with the knowledge that the future event would not occur.

*Higginbottom*, 304 S.E.2d at 368 (internal quotations and citations omitted). As found above, any alleged promise of exclusive participation rights was unsupported by the Participation Agreement, and thus Plaintiff could not have reasonably relied on such a promise. Further, the alleged omission of information about KP's participation rights is unsupported by the factual record. Plaintiff has presented no evidence that Vision had a prior agreement with KP for placement of and participation in POG machines. Any agreement with KP at the time of Plaintiff's contract concerned KP's purchase of POG games for distribution in Oklahoma.

More importantly, the Participation Agreement contained the following "merger clause:"

This agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations and understandings of the parties. In consideration of the execution hereof by Vision, [Plaintiff] hereby released Vision from all claims, demands, contracts and liabilities, if any, which may exist as of the date of this agreement.

Participation Agreement, § 20.2. It is undisputed that Plaintiff has not rescinded the Participation Agreement and, in fact, continues to seek benefits under it. "Therefore, because [Plaintiff] has not rescinded the contract, its fraud claim cannot survive unless it can show misrepresentations by [Vision] that are actually contained in the [Participation] Agreement." *WirelessMD*, 610 S.E.2d at 359; *see Ekeledo v. Amporful*, 642 S.E.2d 20, 22 (Ga. 2007) ("a merger clause operates as a disclaimer of all representations not made on the face of the contract"). As stated above, the Participation Agreement contains no express or implied promise of exclusive participation rights.

Consequently, Plaintiff's fraud claims necessarily fail. *See WirelessMD*, 610 S.E.2d at 359*; see also Ekeledo*, 642 S.E.2d at 22 (by affirming contract with a merger clause, the plaintiffs "effectively disclaimed all of these oral misrepresentations, and, as a result, they have no remaining evidence on which to support their claim of a constructive trust based on fraud"); *Megel v. Donaldson*, 654 S.E.2d 656, 661 (Ga. Ct. App. 2007) (merger clause estopped plaintiff from asserting reliance on earlier representations). Therefore, Vision and Pierson are entitled to summary judgment on the fraud claims.

## D. Tortious Interference with Contractual or Business Relations

[T]he standard for interference with contract or business relations is the same: A plaintiff must show that: (1) "[it] had a business or contractual right that was interfered with"; (2) "the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable"; and (3) "damage was proximately sustained as a result of the complained-of interference."

*Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1188 (10th Cir. 2009) (quoting *Mac Adjustment, Inc. v. Prop. Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979)).

### 1. By Vision and Pierson

Plaintiff contends that Vison and Pierson tortiously interfered with Plaintiff's contracts with the Osage Nation and its business relationships with other tribes that would have agreed to place POG gaming machines in their casinos. The only contracts executed by the Osage Nation were its location agreements with TGI; the record discloses no contract or other business relation between Plaintiff and the Osage Nation. Plaintiff provides no authority for the proposition that Plaintiff can assert TGI's rights or rely on a subsidiary's contract to establish its tort claim. Regarding other tribes, the record discloses no established business relations between Plaintiff and any other Indian tribe. The Court rejects Plaintiff's apparent position in its summary judgment brief that proof of an existing business relationship with a third party is unnecessary. Plaintiff argues it had a "prospective

business relationship with other Tribes" and an "expected profit from the placement of games in any Oklahoma casinos" and contends Vision interfered with a prospective economic advantage arising from the Participation Agreement. *See* Pl.'s Resp. Pierson & Vision's Mot. Summ. J. [Doc. No. 98] at 26. Plaintiff did not plead such a claim in the First Amended Complaint. The court of appeals has rejected the position that the tort of interference with prospective economic advantage is "encompassed" within the tort of interference with business relations, and has ruled that the two torts must be separately pleaded. *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1094 (10th Cir. 2006). A review of the First Amended Complaint reveals that Plaintiff has asserted only claims of interference with the Osage contracts and interference with business relationships with other Indian tribes. *See* First Am. Compl. [Doc. No. 38], ¶¶ 33-49, 58-74. Because Plaintiff has not identified facts to establish an existing contract or business relationship with any tribe, Plaintiff lacks support for an essential element of its interference claims.

Further, other than Vision's alleged interference with TGI's location agreements, the only interference identified in Plaintiff's summary judgment brief is that Vision "wrongfully and maliciously terminated the [Participation Agreement] and effectively terminated [Plaintiff's] future business relationships with other Oklahoma tribes." *See* Pl.'s Resp. Pierson's & Vision's Mot. Summ. J. [Doc. No. 98] at 26. Thus, Plaintiff essentially accuses Vision of interfering with Plaintiff's performance of the Participation Agreement. Oklahoma has recognized a tortious interference claim against a third party who induces a plaintiff to breach its own contract or renders the plaintiff's performance more burdensome. *See Wilspec Tech., Inc. v. DunAn Holding Group, Co.*, 204 P.3d 69, 74 (Okla. 2009). However, such a claim is viable only if the interference comes from one who is not a party to the contract or business relationship that is impaired. *Id.* at 73-74. (citing *Voiles v. Santa Fe Minerals, Inc.*, 911 P.2d 1205, 1209 (Okla. 1996). Moreover, based on

the Court's findings that Vision's termination of the Participation Agreement and refusal to approve TGI's location agreements were contractually authorized, and not wrongful, Plaintiff's tortious interference claim fails as a matter of law.

In short, the Court finds that Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact regarding essential elements of its claims of tortious interference with contract and business relationships. Therefore, Vision and Pierson are entitled to summary judgment on these claims.

### 2. By KP Gaming

Plaintiff contends KP interfered with Plaintiff's performance of the Participation Agreement and its prospective business relations with Indian tribes and expected profit from the placement of POG machines in Oklahoma casinos. Like Plaintiff's claims against Vision and Pierson, the only claims pled in the First Amended Complaint are claims for tortious interference with contract and tortious interference with business relationships. *See* First Am. Compl. [Doc. No. 38], ¶¶ 50-57, 75-82. Thus, any claim for tortious interference with prospective economic advantage is not properly before the Court. Plaintiff does not argue in its summary judgment brief that KP interfered with any contract or business relationship with a particular Indian tribe. Therefore, the Court considers only Plaintiff's claim that KP interfered with the Participation Agreement.

Concerning KP's alleged interference with Plaintiff's contract and business relationship with Vision, Plaintiff contends that it had exclusive participation rights for POG games in Oklahoma with which KP interfered by contacting Indian tribes and attempting to market POG games to them. Under the Court's findings, the premise of Plaintiff's argument fails. The Participation Agreement did not give Plaintiff an exclusive right to place POG games in Oklahoma casinos. Further, although Plaintiff has presented evidence that KP was contacting Indian tribes in Oklahoma during the term

of the Participation Agreement, Plaintiff has presented no fact or evidence to show that KP was attempting to place POG machines and obtain participation revenues, as opposed to attempting to distribute or sell POG machines. This case does not concern the Distribution Agreement or distribution rights.

Further, "[i]t is lawful to 'interfere with the contractual relations of another if [this is done] by fair means, if [it is] accompanied by honest intent, and if [it is done] to better one's own business and not to principally harm another.'" *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1236 (10th Cir. 2006) (quoting *Del State Bank v. Salmon*, 548 P.2d 1024, 1027 (Okla. 1976)). Plaintiff's only evidence of unfair competition by KP is based on testimony by Pierson and Vogt that Vision initially agreed to allow KP to distribute POG games to the Cherokee Nation in Oklahoma but KP did not limit its Oklahoma activities to Cherokee casinos. The record shows, however, that KP subsequently informed Vision that KP was supplying other gaming products to several tribes and inquired of Pierson about Vision's interest in authorizing KP to market POG games to tribes other than the Cherokee Nation. Pierson did not rule out the possibility of expanding KP's distribution of POG machines. Thus, Plaintiff's argument that KP's activities amounted to secret, unauthorized competition is not supported by the factual record. Finally, Plaintiff has not articulated how KP's activities damaged Plaintiff, which never obtained a license from any tribe during the term of the Participation Agreement.

For these reasons, the Court finds that Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact regarding essential elements of its claims of tortious interference with contract and business relationships. Therefore, KP is entitled to summary judgment on these claims.

E. **Civil Conspiracy**

A civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  The essential elements are:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. . . .  As a general rule, an actionable conspiracy must consist of wrongs that could have been actionable against the individual conspirators."  *Schovanec v. Archdiocese of Oklahoma City,* 188 P.3d 158, 175 (Okla. 2008) (internal quotation and citations omitted).  " The evidence of the conspiracy must be 'clear and convincing' and must do more than raise suspicion."  *Dill v. City of Edmond*, 155 F.3d 1193, 1208 (10th Cir. 1998) (citing *Dill v. Rader*, 583 P.2d 496, 499 (Okla.1978)).

As articulated in Plaintiff's summary judgment brief, the conspiracy claim in this case "is based upon Vision and KP's actions in interfering with [Plaintiff's] business relations with Oklahoma Tribes, as well as its prospective income and business advantage from working with these tribes."  *See* Pl.'s Resp. KP's Mot. Summ. J. [Doc. No. 97] at 8.  Under the Court's findings, Plaintiff fails to articulate a conspiracy that either had an unlawful purpose or was accomplished through unlawful acts.  Further, Plaintiff essentially claims that Vision and KP conspired to interfere with Plaintiff's performance of the Participation Agreement.  Plaintiff presents no argument or authority from which to conclude that Oklahoma would recognize such a cause of action.  *See Joseph P. Caulfield & Assoc., Inc. v. Litho Prod., Inc*., 155 F.3d 883, 889 (7th Cir. 1998) (citing split of authority regarding recognition of a claim for conspiracy to tortiously interfere with one's own contract).  Nevertheless, construing the record in the light most favorable to Plaintiff, Plaintiff fails to identify sufficient facts and evidence to avoid summary judgment considering the heightened burden of proof applicable to conspiracy claims.  Plaintiff has not presented sufficient evidence to

support its contention that Vision and KP were working in concert "without [Plaintiff's] knowledge to further place games in Oklahoma casinos and to confuse the tribes to such an extent that they would no longer work with [Plaintiff]," and create a genuine issue for trial. *See* Pl.'s Resp. KP's Mot. Summ. J. [Doc. No. 97] at 9. Therefore, Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

## Conclusion

For these reasons, the Court finds that Defendants are entitled to a judgment as a matter of law on all claims.

IT IS THEREFORE ORDERED that the Motion for Summary Judgment of Defendant KP Gaming Supplies, Inc. [Doc. No. 90] and the Motion for Summary Judgment of Defendants Vision Gaming & Technology, Inc. and Marie Pierson [Doc. No. 92] are GRANTED. Judgment shall be entered accordingly.

IT IS SO ORDERED this 28th day of December, 2009.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE